74 Cal.App.3d 692 (1977)
141 Cal. Rptr. 641
RALEIGH INDUSTRIES OF AMERICA, INC., Plaintiff and Respondent,
v.
FRANK J. TASSONE, Defendant and Appellant.
Docket No. 49985.
Court of Appeals of California, Second District, Division Two.
November 4, 1977.
*694 COUNSEL
Jack Altman for Defendant and Appellant.
Baker, Ancel & Redmond and Gerald T. Manpearl for Plaintiff and Respondent.
OPINION
FLEMING, J.
Plaintiff-respondent Raleigh Industries of America, Inc. (Raleigh) and defendant-appellant Tassone, competing creditors of defendant Meredith, sought to satisfy their claims by resort to the inventory, equipment, and fixtures of a now-defunct bicycle business operated by Meredith.
*695 Meredith defaulted in the action, and Raleigh obtained judgment against him for $18,000. Thereafter in a nonjury trial between Raleigh and Tassone, the trial court found that a prior transfer of inventory to Tassone had violated the bulk transfer law (Cal. U. Com. Code, § 6101 ff.), and in February 1976 the court ordered the inventory sold at public auction to satisfy Raleigh's judgment.[1] Tassone appeals.

History of the Controversy
For 20 months prior to August 1974, Tassone operated a bicycle shop in the San Fernando Valley. The business was a dealership franchised by Raleigh, a manufacturer of bicycles, bicycle accessories, and parts. In August 1974 Tassone sold the physical assets and the business for $39,000 to Meredith, who made a down payment of $18,000 and executed a promissory note for the balance of $21,000. A security agreement provided for a security interest in inventory, fixtures, and equipment sold, which were particularly described in exhibit A of the security agreement. However, by the time of the trial exhibit A had been lost. Nevertheless it was not disputed that the security agreement covered fixtures, equipment, bicycle accessories, and an inventory of bicycles  which Meredith testified consisted of approximately 100 bicycles. The terms of the security agreement did not specifically cover either additions to inventory or replacements for inventory sold.[2] Neither the agreement for the sale of the business nor the security agreement itself were ever recorded (§ 6107), nor was any attempt made to comply with provisions that prescribe the necessity for, and the formality of, filing a financing statement in order to perfect a security interest in movable goods. (§§ 9302, 9401, 9402, and 9403.)
Subsequent to Meredith's purchase of the bicycle business, Raleigh entered a new franchise agreement with him and extended credit to Meredith for the purchase of bicycles and bicycle accessories for his inventory, the credit that provided the basis for Raleigh's present claim.
*696 In February 1975 Meredith defaulted on his note to Tassone, whereupon Tassone, pursuant to the provisions of the security agreement and with Meredith's consent, took possession of all physical assets of the business, including inventory, fixtures, and equipment, and moved them to his own place of business. According to Meredith, Tassone removed inventory consisting of 250 bicycles, of which 50 had been part of the original inventory sold him by Tassone. According to Tassone, he removed about 200 bicycles. The warehouse receipt issued by the storage company to which the bicycles were taken two days after their removal lists the number of bicycles at 205. Tassone sold a small part of the property he removed, but the balance remained in storage as a consequence of Raleigh's complaint, injunction, and attachment. At trial Meredith testified that in February 1975 he owed approximately $60,000, of which $18,000 was owed to Raleigh and $20,000 to Tassone.
The trial court found that Tassone's security agreement was invalid because the statutory requirements for filing had not been complied with; that as a consequence Tassone did not possess a valid security interest in the inventory as against other creditors of Meredith; that the value of the inventory was in excess of $20,000; that the transfer of the inventory to Tassone in February 1975 was a transfer of all physical assets of the business without the requisite notice to creditors and hence it violated the bulk transfer law (§ 6102). The court ordered the inventory sold to satisfy Raleigh's judgment against Meredith. The trial court made no finding and drew no distinction between original inventory, replacement inventory, and additional inventory, apparently concluding that the February 1975 seizure was equally invalid for the entire inventory. Because of the loss of exhibit A of the security agreement, it is not clear what portions of the inventory removed by Tassone were original inventory sold by Tassone to Meredith and what portions were later acquired by Meredith as replacement inventory or as additional inventory. However, it is uncontradicted on the record that only 50 of the 200 to 250 bicycles had been Tassone's original property and described as collateral in exhibit A.
On appeal, the parties, understandably, take divergent views of the law applicable to the case. Appellant Tassone argues the following propositions:
1. As seller-creditor he acquired a purchase money security interest in goods sold and transferred to the buyer-debtor's possession (§ 9107);
*697 2. He did not perfect his security interest by filing;
3. The parties assumed that the security agreement would cover after-acquired property;
4. His purchase money security interest was later perfected by the transfer of goods to his possession (§ 9305);
5. Because a purchase money security interest was involved, compliance with the bulk transfer law was unnecessary (§ 6103).
Respondent Raleigh sees the cause as controlled by a different set of propositions:
1. No purchase money security interest was created on Tassone's sale of the business to Meredith because of lack of recordation and failure to file a financing statement;
2. Neither the inventory sold and transferred by Tassone nor after-acquired inventory purchased by Meredith became subject to a lien to secure Tassone's note;
3. Transfer of possession of a debtor's entire physical assets to a creditor is void under the provisions of the bulk transfer law that require 10 days advance notice to other creditors; without this notice the transfer may be set aside (§§ 6102, 6107);
4. Respondent has priority of lien over appellant because of priority of its attachment and judgment.
We find ourselves unable to agree entirely with either party. In reaching our own conclusions we have been compelled to reconcile the several provisions of the Commercial Code in order to accommodate the somewhat unusual factual features of the cause.[3]

*698 The Commercial Code  Repossession by Seller

We note, first, that the action is controlled by the Commercial Code, which declares that a security agreement is effective between the parties and against creditors, except as otherwise provided. (§ 9201.) To perfect a security interest in goods, the code requires either possession of the goods, actual or constructive, or, in instances of non-possession, a security agreement which has been publicized by the filing of a financing statement with the Secretary of State (§§ 9203, 9401). For a security interest in movable goods to be enforceable under the code the debtor must have signed a security agreement which describes the collateral. (§ 9203, subd. (1)(b).) Such a security interest attaches when (1) there is an agreement that it attach; (2) value is given; and (3) the debtor acquires rights in the collateral. (§ 9204.) (1) At bench, Tassone's security interest met these criteria, for it was evidenced by a writing signed by Meredith describing the collateral to which a security interest would attach, the parties had agreed it would attach, value was given, and Meredith acquired rights in the collateral on its transfer to him. Accordingly, at the time of the original sale of the business Tassone acquired an unperfected security interest in the specific goods identified as collateral by the security agreement. His failure to file a financing statement did not affect the validity of his security agreement. While the filing of a financing statement is an additional step that would have perfected Tassone's interest and given him priority against other creditors in respect to the goods described in the security agreement, filing is not necessary in order to create the security interest itself. (See Cal. U. Com. Code com. to § 9204, and the definition of security interest in § 1201, subd. (37).)
Raleigh, which became a lien creditor in February 1976, argues that Tassone's failure to file a financing statement precludes him from ever perfecting his security interest in the goods described as collateral; therefore Raleigh was entitled to priority, in that a lien creditor takes priority over a creditor with an unperfected security interest (§ 9301). Under the code, however, repossession perfects a security interest in goods identified as collateral (§ 9305). Although such perfection does not relate back to the time the security interest was first created in the collateral, it does attach at the time of repossession and continues so long as possession is retained. (§ 9305.) What is more, Tassone's action in repossessing the collateral is specifically authorized by section 9503  which provides that, unless otherwise agreed, a secured party has *699 the right to take possession of the collateral without judicial process on default of the debtor. Accordingly, Tassone legally perfected his security interest in the specific goods covered by exhibit A of the security agreement by repossessing the collateral from Meredith in February 1975 at a time Raleigh was still an unsecured creditor. Raleigh cannot claim priority as to the specific goods covered by the security agreement, because Tassone's security interest in those goods had been perfected prior to the time Raleigh became a lien creditor. Raleigh's argument against all types of perfection by repossession of a security interest in goods is without merit.

The Commercial Code  Purchase Money Security Interest and Bulk Transfer
(2) But Raleigh also argues that the transfer of possession to Tassone of all of Meredith's movable goods, including his entire inventory, was a bulk transfer (§ 6102), void against creditors for lack of the 10 days notice to creditors required by the code. (§§ 6105, 6107.) Tassone responds that section 6103, subdivision (3) specifically excludes from the provisions of the bulk transfer law a transfer of property in settlement of a security interest whose creation was exempt from the bulk transfer law, and that section 6103, subdivision (1) exempts a purchase money security interest from the requirements applicable to a bulk transfer. To resolve the issue we must determine whether Tassone's security interest in the goods he took into his possession qualified as "purchase money."
Section 9107 defines a purchase money security interest as a security interest "[t]aken or retained by the seller of the collateral [Tassone] to secure all or part of its price." (Italics added.) Tassone's security interest in the goods he originally sold to Meredith, listed in exhibit A, was clearly purchase money under section 9107, in that Tassone was the seller of the described collateral. But those goods only comprised part of the goods Tassone seized in February 1975, for the greater portion of those goods consisted of replacement inventory and additional inventory  which had been sold to Meredith by others. Absent any filing of a financing statement by Tassone and absent any specific reference to after-acquired property in the security agreement, Tassone cannot possibly qualify as "the seller of the collateral" with respect to these other goods; hence any security interest in them in favor of Tassone cannot qualify as a purchase money security interest. Tassone was not the seller of these after-acquired goods; the sellers were third parties, among them bicycle manufacturers such as Raleigh. Hence Tassone's *700 purchase money security interest in Meredith's goods, absent recordation or filing and absent an after-acquired property security agreement, was limited to the original goods purchased from Tassone, identified and described in exhibit A.
Even if Tassone had properly filed a security agreement which specified after-acquired property as collateral for a purchase money security interest, insofar as the agreement dealt with inventory (as opposed to fixtures and equipment) the scope of his security interest might have been further limited by the provision of section 9102, subdivision (4) which in 1975 stated: "(4) Notwithstanding anything to the contrary in this division, no nonpossessory security interest, other than a purchase money security interest, may be given or taken in or to the inventory of a retail merchant held for sale, except in or to inventory consisting of durable goods having a unit retail value of at least five hundred dollars ($500)...."
An inventory of bicycles whose unit retail value is less than $500 is subject to the operation of this provision, which suggests that even a properly filed security agreement which specifies replacement inventory as collateral may not create a valid security interest in inventory items purchased from others. Holzman v. L.H.J. Enterprises, Inc. (9th Cir.1973) 476 F.2d 949, grappled with the difficult question whether a properly filed security agreement which specifies a purchase money security interest in after-acquired goods that replace original purchase money inventory is valid. In construing the then California law the circuit court held that a duly filed and recorded security interest in a stock of inventory sold to the debtor by the lien holder, can specify that it will also cover replacement inventory. The court observed that a security interest in inventory is a wasting interest if it does not attach to replacement inventory, because inventory by its nature turns over rapidly. The court also noted that "The state requirement for giving notice of the financial arrangements serves to protect future sellers of inventory as well as general creditors." (P. 951.) In Holzman two critical distinctions from the factual situation before us must be noted: (1) The purchase money security interest was duly filed under California law, and (2) by its terms it categorically and specifically included replacement inventory. We agree with the circuit court that under the law as it stood at the time of the filing of this cause a properly filed purchase money security agreement may specify coverage of replacement inventory, replacement equipment, and replacement fixtures described in the original security agreement  this even though section 9102, subdivision *701 (4) prohibits a nonpossessory security interest in retail inventory other than a purchase money security interest. Conceptually, this coverage may be visualized as a periodic release of items of original inventory as sold and a periodic substitution of items of replacement inventory to serve as security in lieu of items of original inventory sold. Release of the original security interest perfected by filing, i.e., original inventory, provides new value sufficient to justify the lien on after-acquired collateral, i.e., replacement inventory. (§§ 9108, 9102, subd. (4), 9204, subd. (3).) The same principle would apply to replacement fixtures and replacement equipment.
But an interpretation of section 9102, subdivision (4) that allows a security interest in replacement inventory is no help to appellant, because a financing statement was never filed nor did his security agreement specify a security interest in replacement inventory. As to him the point is academic. We further note that a recent amendment to section 9102, subdivision (4), effective 1 January 1976, states, "[t]he phrase `purchase money security interest' as used in this subdivision does not extend to any after-acquired property other than the initial property sold by a secured party ..." The amendment makes it highly questionable whether under the new law a purchase money security interest can ever cover replacement inventory, even when the agreement so specifies and even when a financing statement has been properly filed.
Once we pass beyond replacement inventory to additions and expansions to inventory purchased from other sellers, nowhere does the code support the proposition that the seller of original inventory can acquire a purchase money security interest in additions to inventory purchased from other sellers. Clearly, when, as here, an inventory of bicycles was increased from 100 to 200 or 250, a purchase money security interest in favor of the original seller of inventory cannot cover additions to inventory, either under section 9102, subdivision (4) in its original form or under the section as it now reads. In short, it is clear that Tassone has no purchase money security interest in after-acquired inventory of Meredith. Such after-acquired inventory came from sellers other than Tassone, and Tassone cannot qualify as "the seller of the collateral" (§ 9107). Hence, the transfer of these goods to Tassone became subject to the bulk transfer law and void against an objecting creditor. (§ 6105.) We conclude that Tassone's security interest was purchase money as to inventory he sold to Meredith, but not as to replacements and additions to inventory sold to Meredith by others. (For the same result reached *702 under pre-Commercial Code law, see Grover v. Tindall (1966) 242 Cal. App.2d 427, 437, 439-440 [51 Cal. Rptr. 617].)
From this analysis, it follows that since Tassone's security interest in the original inventory was purchase money, it was exempt initially under 6103, subdivision (1) from the bulk transfer notice requirements; and because the creation of the lien was thus exempt, so also the transfer back of original inventory in settlement of the lien was exempt under 6103, subdivision (3). A creditor who possesses a purchase money security interest in specific goods he has sold may perfect that interest by taking possession of the collateral in satisfaction of that interest and thereby gain priority over general creditors who have not become lien or secured creditors prior to such possession. This interpretation accords with the California Uniform Commercial Code comment conclusion that section 9301 as written "... provides that an unperfected security interest is subordinate to the rights of lien creditors who acquire their liens without knowledge of the prior security interest and before it is perfected. The section rejects the rule, applied in many jurisdictions to chattel mortgages and in a few to conditional sales, that an unperfected security interest is subordinate to all creditors." (West's Ann. Cal. U. Com. Code, § 9301, p. 440.) (Italics added.)
However, the bulk transfer exemption of section 6103 only extends to purchase money security interests. Accordingly, Tassone seized more goods than he was entitled to take without notice, because only a minority of the items seized were items Tassone had originally sold to Meredith. To the extent that Tassone seized goods he had not himself sold to Meredith, his security interest was not purchase money, was not exempt from the bulk transfer law, and his seizure of such items without the required notice could be set aside by an unsecured creditor such as Raleigh. In sum, the seller of collateral can acquire a purchase money security interest in goods sold, even without the filing of a financing statement, and he can repossess the goods he himself sold. But he cannot repossess goods he never possessed, i.e., goods sold to the debtor by others. At bench, Tassone could not, without notice under the bulk transfer law, seize all movable goods, including the entire inventory of Meredith's business, and apply them in satisfaction of his claim.
To resolve this cause it is necessary for the trial court to make a further factual finding that divides the goods Tassone seized into two groups: (1) items originally sold to Meredith, described in exhibit A, which became subject to the purchase money security agreement and which Tassone *703 was entitled to repossess; and (2) items of replacement inventory and additional inventory purchased from others, whose disposition was subject to the bulk transfer law, and whose seizure Raleigh was entitled to set aside.
The judgment is reversed, and the cause is remanded to the trial court for further proceedings in accordance with this opinion. Costs to appellant.
ROTH, P.J.
I concur in the opinion and disposition of the appeal reached by my learned colleague. However, I believe that it would have been possible to affirm the judgment upon bases not considered in the court's opinion. The exhibits in the record and undisputed evidence reveal that Tassone has already been paid in full for everything he delivered to Meredith; and that Tassone does not have a valid chattel mortgage as has been determined by the trial court in the findings and judgment before us.
Tassone predicates his "security interest" on a sale made by him to Meredith on August 19, 1974, whereby Tassone sold his inventory and fixtures and allegedly sold his business operated under the name of "Gus Dandos Raleigh Cycle Center" (Dandos) and the good will thereof to Meredith. The sale was consummated by: (a) payment of $18,000 cash; (b) the execution of three documents included in Tassone's exhibit C entitled (1) "Agreement" (Agreement), (2) "Security Agreement  Accounts Receivable," and (3) "Security Interest in Goods and Chattels;" and (c) execution of a promissory note for $20,902.86 (defendant's exhibit D) called for by Agreement.
In pertinent part, Agreement provides:
"1. The Buyer shall pay the total of the following items to Seller which shall be the total purchase price for `Dandos':
"A. $20,000.00 for goodwill.
"B. The value of the inventory as of the date of this Agreement, plus four (4%) percent.
"C. The value of all trade fixtures, including signs, as of the date of this Agreement.
*704 "2. Seller shall execute a bill of sale to Buyer.
"3. The Buyer shall, on the execution of this Agreement, pay to Seller the sum of Eighteen Thousand ($18,000.00) Dollars in cash. The balance of the purchase price is to be evidenced by a promissory note payable over a five (5) year period with interest at Ten (10%) percent per year on the unpaid balance to be secured by the inventory, trade fixtures and receivables of the transferred business.[[1]] The Buyer shall, in addition have the right to pre-pay some or all of the unpaid balance without penalty.
"4. The Seller shall cause all outstanding obligations of `Dandos' to be paid in full as of the date of execution of this Agreement.
".... .... .... .... ...
"6. Buyer shall not use the name, `GUS DANDOS' in any manner whatsoever in connection with his newly acquired bicycle business. Further, Buyer shall cause the name `Gus Dandos' to be removed from all advertising and signs dealing with the subject business.
".... .... .... .... ...
"10. The Seller makes no representations or warranties concerning the future financial prospects of `Dandos.' For the record, the Buyer is very well acquainted with the business he is purchasing because of his employment by the business. The Buyer is entering into this Agreement on his own information and his own understanding of the facts and not in reliance on any representations by the Seller." (Italics added.)
Agreement further provides for immediate termination of the lease; the discontinuance of all utility arrangements for the Dandos premises; and requires Meredith to make all his own arrangements for lease with the landlord; for the utilities; with the Board of Equalization and also provides for various forms of indemnity from Meredith to Tassone for all deposits previously made on the lease or with the various utilities.
Exhibit C, in addition to Agreement, contains as mentioned above, a "Security Agreement  Accounts Receivable" (document (2) limited to *705 "receivables" as therein defined and not involved at bench), and also document (3) entitled "Security Interest in Goods and Chattels" ("Security Interest") which embraces the merchandise inventory "... tools, and trade fixtures and signs and accounts receivable...." This "Security Interest" agreement provides in pertinent part:
"2. DEBTOR hereby grants SECURED PARTY a continuing security interest in the goods (as defined in Article 9 of the Uniform Commercial Code) described in the annexed Exhibit `A'.[[2]] DEBTOR also grants SECURED PARTY a continuing security interest in all proceeds and products of the Collateral.
"3. The security interest so granted shall be to secure the payment of all principal and interest and the true, full and exact performance and observance of all of the covenants and conditions of that certain installment note marked Exhibit `B'[[3]] (herein referred to as the `Obligation') and made a part hereof as if set forth in full herein.
".... .... .... .... ...
"9. Upon DEBTOR'S default hereunder, then, at the option of the SECURED PARTY and without notice or demand, all of the unpaid installments and other Obligations of DEBTOR hereunder shall become immediately due and payable and then and thereafter the SECURED PARTY shall have all of the rights and remedies of a secured party under the Uniform Commercial Code as it exists at the time of the execution hereof and hereafter. In addition, the SECURED PARTY shall have the right: to take and maintain possession of the Collateral and in so doing, alone or with any other person, enter upon the premises where the Collateral may be found or believed by the SECURED PARTY to be located, and to maintain such possession and dispose of the Collateral on any premises of DEBTOR or under DEBTOR'S control; and/or to remove such Collateral or any part thereof to any place the SECURED PARTY may desire. If requested by the SECURED PARTY to do so, DEBTOR shall assemble and make the Collateral available to the SECURED PARTY at a place to be designated by the SECURED PARTY."
In my opinion, the "Security Interest" is, as the trial court found, invalid. It is true as pointed out that the trial court based its opinion of *706 invalidity upon violation of the bulk sales law. And it is also true that Raleigh tried its case on that theory. However, it is well settled law that if the facts before the trial court support the judgment rendered on a different theory, an appellate court may support the judgment on such a theory. (Davey v. Southern Pacific Co. (1897) 116 Cal. 325, 329 [48 P. 117]; Harley v. Superior Court (1964) 226 Cal. App.2d 432, 435 [38 Cal. Rptr. 72].)[4]
Section 9204, a portion of article 9 of the Uniform Commercial Code, provides in pertinent part: "(1) A security interest cannot attach until there is agreement ... that it attach and value is given and the debtor has rights in the collateral. It attaches as soon as all of the events in the preceding sentence have taken place unless explicit agreement postpones the time of attaching." (Italics added.)
It is apparent from a comparison of the amount of the promissory note ($20,902.86) and the purchase price as fixed by paragraphs 1, A, B and C and other portions of Agreement that the $18,000 paid by Meredith in cash to Tassone represented payment in full for all the inventory sold by Tassone to Meredith and that, except for the sum of $902.86, the note for $20,902.86 represented payment for good will.[5] It is also apparent from an analysis of Agreement, the other documents in exhibit C, the note and the facts that no good will was sold or delivered. To the contrary, paragraph 6 of the Agreement above quoted and other clauses of the Agreement expressly require an elimination of the name of Gus Dandos or Dandos from the business and enjoin Meredith from using the name or the signs "Gus Dandos" or "Dandos" although the signs were apparently part of the subject matter sold. Meredith received, and Tassone transferred, no good will except such as might flow from the physical location of the business with respect to which no lease was transferred. And even as to this one illusive item of good will, to wit: the physical location over which Tassone presumably had some control, Tassone not only did not transfer the signs or his lease on the premises, but he specifically withheld a transfer. Tassone made no covenant that he would guarantee a transfer of the lease or even assist in the consummation *707 of a transfer thereof. The Agreement does in fact provide the contrary: "It is understood between the parties that the current property lease between Seller and his lessor shall be terminated. The Buyer shall enter into a new lease directly with the lessor." (Italics added.) The record does not show the term of the Tassone lease or that it was in fact ever transferred; whether a new one was made by Meredith for a fixed term; or whether Meredith occupied the premises as a month-to-month tenant or any of the other terms of Meredith's tenancy. The record shows affirmatively that Tassone could not and did not transfer to Meredith the name "Raleigh Cycle Center" nor did he or could he transfer the franchise to dispose of merchandise manufactured or distributed solely by Raleigh. In this connection the record suggests that on some date preceding November 4, 1974, Meredith negotiated for such a franchise and succeeded in obtaining one on or about January 1, 1975.
The trial court found pertinent facts as follows:
"2. Within two years prior to filing the present lawsuit, Dennis Wayne Meredith dba Raleigh Cycle Center, became indebted to the plaintiff, and at the time of trial was indebted to the plaintiff in the amount of $18,465.32, plus interest thereon at the legal rate, from November 30, 1974....
".... .... .... .... ...
"6. On or about February 21, 1975, the defendant Frank Tassone was given and took full and complete possession of the business known as Raleigh Cycle Center, and Frank Tassone took over the possession of the inventory and other assets.
"7. On or about February 21, 1975, all of the assets, including all inventory, equipment and fixtures, of Raleigh Cycle Center were picked up by Frank Tassone and transferred to his own place of business.[[6]]
"8. At the time the assets were transferred to Frank Tassone, and at the time he took possession of Raleigh Cycle Center, he did not have a valid security interest in any of the goods of Raleigh Cycle Center, *708 including the inventory and fixtures and equipment, as against creditors of Meredith.
".... .... .... .... ...
"11. In connection with the transfer of assets to Frank Tassone, there was no notice of such transfer recorded or published, of any kind, including the notice required by Commercial Code Section 6102 et seq., and particularly Section 6107."
A fair analysis of the documents executed to consummate the Tassone-Meredith transaction equates with an attempt to acquire a "Security Interest" unrecorded, unfiled and unknown,[7] on inventory which had been paid for in full on the date it was delivered, for good will valued at $20,000 which good will, however, was not only not delivered but expressly withheld.
To summarize, before Meredith amiably surrendered his inventory to Tassone on request therefor, Meredith, on premises theretofore used by Tassone, had operated for the limited period of six months a bicycle shop business with the inventory, fixtures and good will for which he had obligated himself to pay Tassone approximately $40,000. During that six month period, Meredith purchased additional merchandise on credit, of which at least $18,000 worth was from Raleigh, which amount was unpaid. Among other debts, Meredith allegedly owed approximately $20,000 to Tassone. To satisfy that $20,000 debt, Tassone with Meredith's consent, picked up the entire Meredith inventory and removed it to his new place of business. It is clear that if this inventory is sold to satisfy Tassone's alleged "security interest" he will receive payment in full for a marketable commodity which he never delivered. The expeditious and summary manner adopted by Meredith and Tassone to satisfy Tassone's debt in full to the exclusion of other creditors but with their merchandise appears to be "sicklied o'er with the pale cast ..." of fraud.
COMPTON, J.
I concur in a reversal of the judgment but must respectfully dissent from the majority decision to award Raleigh an interest in that part of the inventory which consists of replacement items.
*709 The two opinions which comprise the majority give some evidence of the difficulties we have encountered in attempting to effect a resolution in this case. The majority perceives a potential for fraud in the way in which Tassone conducted himself and thus have, in my opinion, misapplied the clear provisions of the California Uniform Commercial Code in an effort to reach a result which is "commercially sound."
It could well be that the result which I believe to be compelled by the statutes is not "commercially sound" and would under some circumstances permit the perpetration of a fraud. There is no evidence in this case, however, that the arrangement between Meredith and Tassone was conceived in fraud. If the Uniform Commercial Code as adopted in California has a weakness, the Legislature is the proper branch of government to provide the correction. It is not proper for this court to add concepts to the statutory law which it does not contain nor to give interpretation to its words which are contrary to their plain meaning.
My Brother Roth in his well-reasoned concurring opinion indicates that he would give complete preference to Raleigh but advances a theory that was never advanced by Raleigh either in the trial court or in the briefs on appeal. Nevertheless I would point out that it is a fundamental rule that the courts should not weigh the quantum of consideration as long as it has some value. (Schumm v. Berg, 37 Cal.2d 174 [231 P.2d 39, 21 A.L.R.2d 1051]; Taylor v. Taylor, 66 Cal. App.2d 390 [152 P.2d 480].)
The conferring of a benefit on one party to the contract is sufficient consideration to support the contract. (See 1 Witkin, Summary of Cal. Law (8th ed.) Contracts, §§ 150, 151, pp. 144-145.) The consideration here was that transfer to Meredith of a going business with inventory and good will.
The case before us is simply a contest between two creditors of a defunct business, one of whom holds a validly executed written purchase money security agreement and one of whom is a general creditor.
The majority concedes that Tassone's security interest was at all times valid as between him and Meredith and as of the date of possession was "perfected" as against other general creditors at least insofar as the original inventory is concerned.
*710 Contrary to the majority's statement, that security interest specifically recited that the "collateral" consisted of the present inventory as well as replacements, substitutions and additions.[1]
The Uniform Commercial Code clearly recognizes the validity of an after-acquired property provision in a security agreement. Such provisions constitute the major basis for inventory financing which is a widely used commercial device. (69 Am.Jur.2d, Secured Transactions, §§ 339-341, pp. 174-177.) Further the code throughout gives favorable treatment to persons who advance money for the purchase of the property to be used as collateral. (69 Am.Jur.2d, Secured Transactions, § 492, p. 363; also see Holzman v. L.H.J. Enterprises, Inc., 476 F.2d 949, cited by the majority.)
Also contrary to the majority's statement, Tassone was the "seller of the collateral" as that term is used in Uniform Commercial Code section 9107. In fact the majority concedes this as to the original inventory. The point of departure is that part of the inventory which consists of replacement items. These items, however, are part of the collateral which was sold by Tassone because in any situation where inventory is pledged as collateral it is contemplated that there will be a turnover. How else could a business operate?
As the original items were sold Tassone released his security in contemplation of replacement. This is the essence of inventory financing. No reasonable interpretation of the code will permit the splitting of the collateral between original and replacement inventory which the majority attempts here.
The case of Grover v. Tindall, 242 Cal. App.2d 427 [51 Cal. Rptr. 617], which is described as reaching the same result as the majority, appears to my reading to support a different result. True the court in that case refused to enforce an after-acquired property clause in a chattel mortgage on the inventory of a store but it did so on the basis of a *711 statute  Civil Code section 2955  which was repealed prior to the transaction in this case. That statute specifically prohibited a chattel mortgage on the stock in trade of a merchant. The recent amendment to the California Uniform Commercial Code section 9102, subdivision (4), referred to by the majority, which amendment came after the events of this case, points unerringly to the conclusion that after the repeal of Civil Code section 2955, and before the amendment, a security device such as the one now engaging our attention was perfectly valid and enforceable.
In the final analysis the result reached by the majority is that in a case where the collateral for a purchase money loan consists of inventory with a specific provision that it include replacement items, the purchase money security interest can only be perfected as to the replacement items by recording. This simply ignores the provision of California Uniform Commercial Code section 9305 and finds no basis in any other provisions of the code.
Tassone's right to retain the inventory is based on the general rule that, as between the parties, an unrecorded or "unperfected" security interest in chattels is valid. As against general unsecured creditors who have not obtained a writ of attachment or other lien, such a security interest is "perfected" by taking possession of the property pursuant thereto. (Cal. U. Com. Code, § 9305.)
Section 9201 of the code prescribes that generally a security agreement is effective between the parties and as against creditors except as otherwise provided in the code. Section 9301 of the code "otherwise provides" by specifying that a creditor who has acquired a lien by attachment or levy has priority over the claim of an "unperfected" security interest.
As noted, Raleigh became a lien creditor in February of 1976. It now contends that Tassone had not perfected his security interest prior to that date and that by virtue of California Uniform Commercial Code section 9301, it had priority. Further, Raleigh argues that the transfer of the inventory from Meredith to Tassone was a "Bulk Transfer" (Cal. U. Com. Code, § 6102), and Tassone failed to give notice to creditors as required by the Bulk Transfer provisions of the California Uniform Commercial Code (Cal. U. Com. Code, § 6105).
Raleigh's reliance on the bulk transfer requirements is misplaced. California Uniform Commercial Code section 6103 specifically exempts *712 from its provisions: (1) a transfer to give a purchase money security interest, or (2) a transfer made in settlement or realization of a lien or other security interest to which the property is subject if the creation of the lien was exempt.
It is undisputed that Tassone's interest was a purchase money security interest, thus, the question here is simply whether Tassone had perfected that interest prior to the time Raleigh became a lien creditor. If so, the transfer was exempt from the Bulk Transfer provisions. If not, section 9301 would make Tassone's interest subordinate to Raleigh's in any event.
The filing of a financing statement is not the only way in which a security interest may be perfected. California Uniform Commercial Code section 9302 exempts from the filing requirement a security interest in collateral which is in possession of the secured party.
Where the collateral is not in possession of the secured party at the time the security interest is created, that security interest may be later perfected by the taking of possession. (Cal. U. Com. Code, § 9305.) In that event the security interest is perfected as of the time possession is taken, and although such perfecting of the interest does not relate back so as to give it priority over intervening lien creditors, it does continue so long as possession is retained. (Cal. U. Com. Code, § 9305.)
At the time Tassone took possession of the collateral pursuant to his purchase money security interest, Raleigh was merely a general creditor. It did not become a lien creditor until a later date.
Thus, even though Tassone's interest does not relate back to the date of its creation, it was, pursuant to California Uniform Commercial Code section 9305, "perfected" as of the date of possession, a date on which Raleigh occupied the status of a general creditor.
The problem presented here is one which was subject to considerable discussion at the time of the adoption of the California Uniform Commercial Code in California as demonstrated by the extensive comments which follow California Uniform Commercial Code section 9301 (West's Ann. Cal. U. Com. Code, § 9301, pp. 433-434.)
These comments analyze prior California and federal law in relation to the Model Code, concerning the rights of general creditors versus *713 holders of unperfected security interests. The comments conclude, however, that section 9301 as written "... provides that an unperfected security interest is subordinate to the rights of lien creditors who acquire their liens without knowledge of the prior security interest and before it is perfected. The section rejects the rule, applied in many jurisdictions to chattel mortgages and in a few to conditional sales, that an unperfected security interest is subordinated to all creditors." (West's Ann. Cal. U. Com. Code, § 9301, p. 440.) (Italics added.)
Here Tassone was lawfully entitled to take possession of the collateral by virtue of his chattel mortgage, and upon taking possession his position was at least as strong as that of any attaching general creditor as against a nonattaching general creditor.
The taking of possession by the holder of an unperfected purchase money security interest is no different in result than attachment by any unsecured creditor at least insofar as it affects other general unsecured creditors.
I have difficulty understanding the desire of the majority to give preference to Raleigh. Meredith owed money to both Tassone and Raleigh and the general rule based on the common law is to reward diligent creditors. Beyond that Tassone was a purchase money lender who has additional preference under the code.
Assume that both Raleigh and Tassone were both creditors with unperfected security interests looking to the same collateral in the debtor's possession. Whichever perfected its interest first, either by taking possession or filing, would have priority whether or not he knew of the other's interest. (See West's Ann. Cal. U. Com. Code, § 9312, and example 2 which is contained in the comment following at p. 525.) Here the situation is not that evenly balanced because Raleigh had no security interest either perfected or unperfected. Raleigh was simply a general creditor who lost the race to attachment.
Another factor which in my opinion weighs heavily against Raleigh is the fact that after the transaction between Meredith and Tassone. Raleigh franchised Meredith as one of its dealers. Surely at that time it was in a position, having the bargaining power and resources of a large interstate supplier, to require Meredith as a condition of granting the franchise, to disclose the details of his acquisition of the business. Furthermore Raleigh could have easily shipped its merchandise on *714 consignment or under a security arrangement that would have assured its priority against any unrecorded encumbrances.
I would reverse the judgment and direct the trial court to enter judgment for Tassone to the extent of Meredith's indebtedness to him.
NOTES
[1] All references are to the California Uniform Commercial Code. All sums are given in rounded figures.
[2] The security agreement did contain a provision declaring that collateral "installed in or affixed to" other goods or goods "installed in or affixed to" collateral become subject to the provisions of the security agreement. We do not read this provision as providing coverage for replacement or additional inventory. Rather its import is that a part incorporated in a larger whole becomes part of that whole, as does a tire when put on a bicycle or an inner tube when put into a tire.
[3] We characterize the factual situation as unusual because most security agreements purporting to create a purchase money security interest in inventory (1) will be perfected by the filing of a financing statement, (2) will specifically refer to after-acquired replacement inventory, and (3) will specifically describe the inventory which is to serve as collateral. A further unusual feature of the present case is that for reasons which are not clear the trial court vacated the seizure of inventory by Tassone, but upheld his seizure of fixtures and equipment.
[1] The payment of $18,000 was made and note delivered as required by document (1) Agreement and the security furnished by document (3). The record does not show any accounts receivable; the trade fixtures are in the undisputed possession of Tassone and are not, nor are any accounts receivable, involved in this litigation.
[2] Exhibit A is not annexed and is not in the record.
[3] This exhibit B is exhibit D in the record.
[4] Even the parties may change their theory on appeal when questions of law alone are presented. (Ward v. Taggart (1959) 51 Cal.2d 736, 742 [336 P.2d 534]; Mitchell v. Marklund (1965) 238 Cal. App.2d 398, 403 [47 Cal. Rptr. 756].)
[5] The record does not suggest the value of the fixtures. The fixtures, however, are not in any way involved in this action and as stated in footnote 1 are not, nor were they ever made a part of the injunctive order or the judgment appealed from. It is difficult to believe that the value of the fixtures was less than $902.86.
[6] Because of a default with respect to payments due to Tassone from Meredith on the $20,000 promissory note, Meredith by voluntary arrangement with Tassone and without notice to anyone allowed Tassone to take possession of his complete inventory and move it to a vacant storeroom controlled by and in the possession of Tassone.
[7] In pertinent part, finding 5 states: "... Neither ... security agreement nor a financing statement had been filed with the Secretary of State or any other filing officer."
[1] The clause reads: "DEBTOR hereby declares that should the Collateral or any part thereof ever be installed in or affixed to other goods or should other goods ever be installed in or affixed to or used in connection with the Collateral or any part thereof, specifically including, but not limited to, accessories, parts, replacements, substitutions, additions, improvements and repairs and the increase and increment thereof, then such acts of installation and/or affixation and/or use would be performed for the purpose, among other things, of such other goods being and becoming subject to the terms, provisions and conditions of this Agreement and to the security interest provided for herein, and a part of the Collateral and automatically referred to herein whenever said word is used as if originally subject hereto."